UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | No. 04 CR 64 |
| v. | ) | Judge Blanche M. Manning |
| | ) | |
| CAREY PORTMAN. | ) | |

**MEMORANDUM AND ORDER**

Defendant Carey Portman was convicted of seven counts of bank fraud, *see* 18 U.S.C. § 1344, and possessing forged securities, *see* 18 U.S.C. § 513(a). Count One was based upon Portman's use of false Nigerian inheritance documents in his unsuccessful attempt to obtain a $102,825 loan from Citibank. The remaining six counts are based upon four separate incidents in which he attempted to negotiate or deposit forged checks. He is before the court for sentencing.

Portman's probation officer calculated the following sentencing range under the Sentencing Guidelines. First, the offenses are grouped because the conduct of each count would be deemed relevant conduct for every other count. *See* U.S.S.G. § 3D1.2©, (d). The base offense level is 7 because the maximum statutory term is 20 or more years' imprisonment. *See* U.S.S.G. § 2B1.1. To that, 16 levels are added for an intended loss of more than $1,000,000. Finally, two levels are added because the offense involved ten or more victims. The resulting adjusted offense level is 25. The probation officer did not credit Portman with acceptance of responsibility, so his total offense level was also 25. The probation officer assigned Portman one criminal history point (although the PSR is not clear on what crime the point was premised), and a criminal history category of I. An adjusted offense level of 25 combined with a criminal history category of I results in a sentencing range of 57-71 months.

Portman has filed two sentencing memoranda. In one memorandum, he challenges the calculation of intended loss set forth in his presentence report and asks for a downward departure based upon his argument that the amount of intended loss overstates the seriousness of his crime. In the other memorandum, he moves for a downward departure based upon diminished capacity. He also challenges the probation officer's assertion that his offenses involved ten victims—Portman contends that the five alleged victims of his Nigerian inheritance scam should not be counted, which would reduce by two his total offense level. In response, the government stands by the probation officer's calculation of intended loss and the number of victims, and argues against a downward departure.

**I.     Portman's Objections to Guidelines Calculations and Motions for Downward Departures Based Upon Overstated Intended Loss and Diminished Capacity**

    **A.     Calculation of Loss & Number of Victims**

The probation officer calculated an intended loss of $1,020,825, based upon the following conduct:

*Nigerian Inheritance Scam*
| | |
|---|---|
| $102,825 | attempted loan from Citibank |
| $120,000 | attempted loan from Daniel O'Connell |
| $120,000 | attempted loan from Stephen Spitzer |
| $120,000 | attempted loan from Advantis |
| $30,000 | attempted loan from Stone Pine and Paul Bagley |
| $20,000 | attempted loan from Stone Pine and Paul Bagley |

*Forged Checks Scam*
| | |
|---|---|
| $125,000 | forged check he attempted to cash at Oak Brook Bank |
| $155,000 | forged check he attempted to cash at North Community Bank |
| $100,000 | forged check he attempted to cash at Washington Mutual Bank |
| $128,000 | forged check he attempted to cash at TCF Bank |

### 1. *Nigerian Inheritance Scam*

First, Portman objects to including any of the intended loss attributed to the Nigerian inheritance scam except for the $102,825 he attempted to obtain from Citibank. He argues that the other loans were the subject of counts that the government dropped before trial. Therefore, the alleged conduct was not proven at trial beyond a reasonable doubt. Additionally, he argues that because the Nigerian inheritance scam was not proved beyond a reasonable doubt, the probation officer should not have included the five alleged victims when he determined that Portman's offenses involved ten victims.

A district court may resolve contested matters relevant to sentencing, determining facts by a preponderance of the evidence. In making factual determinations, the district court is entitled to rely on the proposed findings in the presentence report, as long as the presentence report sufficiently articulates the basis for its findings. *See United States v. Burke*, 148 F.3d 832, 835 (7th Cir. 1998). The defendant may not challenge the factual findings in the presentence report by merely denying them, but rather must present evidence that the findings are unreliable. *See United States v. Mustread*, 42 F.3d 1097, 1101-02 (7th Cir. 1994).

The presentence report details each of the instances in which Portman attempted to obtain loans as part of his Nigerian inheritance scheme, and attaches copies of letters that Portman wrote to each of his victims in which he acknowledges attempting to obtain loans in the amounts described. The presentence report therefore sufficiently identifies the basis for its findings. Furthermore, at sentencing the parties questioned two agents who investigated Portman—postal inspector Gabriel Ortiz and special agent Jason Kane. Both Ortiz and Kane offered testimony consistent with the findings in the presentence report and the court found their testimony to be

entirely credible. Although Portman objects generally to the findings in the presentence report and to the facts as testified by Ortiz and Kane, Portman has not presented evidence that the testimony or the findings in the presentence report are unreliable, and in fact does not even challenge their truthfulness.

Accordingly, the court adopts the presentence report's calculation of intended loss arising from Portman's Nigerian investment scam. It also accepts the probation officer's calculation of the number of Portman's victims.

### 2. *Forged Check Scam*

Second, Portman objects to the probation officer's calculation of the intended loss attributable to the forged check scam. As part of the forged check scam, Portman presented forged checks to banks in amounts ranging from $100,000 to $155,000. In one instance, he asked that a $100,000 check be immediately cashed, but his request was denied and he left with the forged check. In the other three instances, he presented the checks for deposit into existing accounts he owned and sought to immediately withdraw funds. Only one request for immediate withdrawal was granted; the other banks put a hold on the deposits. However, in all but one instance Portman was later able to make withdrawals against those deposited funds. Oak Brook Bank even permitted repeated withdrawals over the course of a week before discovering that Portman's check was forged. Even after discovering that Oak Brook Bank had frozen his account, Portman still demanded to be allowed to withdraw additional funds.

The probation officer based his calculation of intended loss on the full amount of the forged checks that Portman deposited or attempted to cash. But Portman argues that because he

never attempted to withdraw the full amount of each forged check deposited, the intended loss should be based only on the amounts he attempted to withdraw.

In support, Portman likens his crime to "split deposit" schemes. In a "split deposit" scheme, a criminal presents a bank with a forged check and deposits most of the funds but immediately withdraws a small percentage. Under Portman's view, the small percentage actually withdrawn is the intended loss. The face value of the check is the *potential* loss, which Portman contends is not relevant to sentencing. *See United States v. Hinton*, No. 01-2960, 2003 WL 1706046, at *1 (3rd Cir. Apr. 1, 2003) (in split deposit schemes, the intended loss is the amount actually withdrawn, as opposed to the potential loss which is the face value of the check).

However, Portman's crimes are distinguishable from the "split deposit" schemes he describes. In a "split deposit" scheme, the criminal immediately withdraws only a small percentage of the face value of the forged check. His crime is complete immediately, and therefore the intended loss is limited to the amount of the immediate withdrawal. In contrast, Portman's crimes were not completed when he deposited his forged checks. When possible, he kept returning to make additional withdrawals. In one instance, Portman even demanded that a forged check be immediately cashed for its full face value. Indeed, Portman's counsel concedes that "the obvious goal of the defendant was to withdraw as much as feasibly possible, within allowable banking rules, in *several* transactions without arousing suspicion and before the check was returned as counterfeit or altered." Defendant's Objection to Presentence Report at 8 (emphasis added). Because Portman's crimes consisted of *repeated* attempts to withdraw as much as banking rules allowed, as opposed to the *single* attempt that occurs in "split deposit" schemes, his reliance on "split deposit" cases is inapposite. *See also United States v. Geevers*,

226 F.3d 186, 192-93 (3d Cir. 2000) (even if the defendant realizes that he may not succeed in eventually withdrawing the full amount of a deposited check, if the sentencing court concludes as a matter of fact that he intended to take as much as he could, then the court may calculate intended loss based upon the full amount of the deposited checks).

The other cases Portman cites distinguishing between intended loss and potential loss are also inapposite. *See United States v. Channapragada*, 59 F.3d 62, 66 (7th Cir. 1995); *United States v. Johnson*, 16 F.3d 166, 171-72 (7th Cir. 1994). Those cases concern fraudulently obtained loans and whether the intended loss calculation should take into account the extent to which the defendant intended to repay the loan. Portman's offense is distinguishable because (1) Portman's crimes did not involve loans, and (2) he has not argued that he intended to repay any amounts that he fraudulently withdrew.

According to the evidence at trial, Portman either demanded payment of the full face value of his forged checks, or he deposited the checks and attempted to repeatedly withdraw as much as he could. When one bank froze his account after discovering that his check was a forgery, he *still* demanded that the bank make additional funds available. Therefore, the court adopts the probation officer's calculation of intended loss, based upon the full face value of the deposited checks.

B. **Intended Loss Overstates Seriousness of Offense**

Additionally, Portman requests a downward departure, arguing that the intended loss "substantially overstates the seriousness of [his] offense." *See* U.S.S.G. § 2B1.1, comment (n.19©) (providing for downward departures where offense level overstates the seriousness of offense). As a threshold matter, the Seventh Circuit has held that the concept of a downward

departure under the Sentencing Guidelines is outmoded in light of *Booker*. *See United States v. Dale*, 498 F.3d 604, 611 n.6 (7th Cir. 2007). Therefore, the court will address Portman's arguments for a downward departure as a request for a sentence under his Guidelines range through application of the factors under 18 U.S.C. § 3553(a).

In support of his argument for a sentence below his Guidelines range, Portman argues that his intended loss overstates the seriousness of his offense because his scheme was doomed to fail and caused little to no actual loss. In support, he cites *United States v. Roen*, 279 F. Supp. 2d 986, 990 (E.D. Wis. 2003), in which the defendant obtained a loan which he repaid with checks drawn on a closed account to the tune of $19,000. He wrote other checks on the same closed account in an attempt to purchase high-priced merchandise amounting to $1.2 million, but the defendant failed to obtain any of the high-priced merchandised because each of those checks was refused. *Id.* The district court concluded that although the defendant intended a loss of over $1.2 million, the intended loss overstated the seriousness of his offense because there was no reasonable possibility that the defendant's scheme to obtain high-priced merchandise could have succeeded, evidenced by the fact that no retailer accepted his bad checks. *Id.* at 991-92.

Portman's situation is distinguishable. For the most part, the banks did accept for deposit his forged checks, and on numerous occasions allowed him to withdraw some of the deposited funds. Therefore, his scheme was not doomed to fail, and in fact succeeded, though not to the extent he had hoped. Accordingly, the court rejects Portman's argument that his intended loss overstates the seriousness of his offense. Although the seriousness of his offense is a characteristic relevant under § 3553(a)(1), as discussed above the seriousness of his offense is not overstated by his intended loss figure.

C.  **Diminished Capacity**

In his second motion, Portman requests a sentence below his Guidelines range based upon diminished capacity. Portman argues that he is entitled to a lower sentence for diminished capacity based upon a psychological assessment by Dr. Nelson Borelli, attached to his motion, as well as Dr. Borelli's testimony at sentencing. According to Dr. Borelli, Portman has a reduced "mental capacity that prevents him from conducting his life in compliance with customary and legal norms" and prevents him from understanding the wrongfulness of his behavior. Borelli Updated Assessment (attached as exhibit C to Portman's sentencing memorandum) at 1. Dr. Borelli believes that Portman's mental condition may stem from a brain illness he suffered at age 12, Reye syndrome. Dr. Borelli also testified that Portman lives in a dream world, which contributed to his involvement in "puerile, grandiose business transactions as if they were real and legitimate, leaving the evidence behind as if it would evaporate by itself." Borelli Original Assessment (attached as exhibit A to Portman's sentencing memorandum) at 7.

The government attempts to undermine Dr. Borelli's assessment, noting that it is based solely on Portman's own statements, and does not take into account any other reports of Portman's conduct or the impressions of others. The government also notes that Dr. Borelli initially characterized his opinion as "speculative," and solidified it only after Portman's trial and in light of Portman's post-trial admission that he lived in "a world of his own unrealities," Borelli Updated Assessment at 1. The government therefore suggests that Portman has merely told Dr. Borelli what the doctor needed to hear to support a finding of diminished capacity, which Portman hoped would lead to a lighter sentence. Finally, the government argues that by

maintaining his innocence, Portman undermines his argument that his wrongful conduct was attributable to diminished capacity.

However, the court need not resolve the dispute over whether Portman has ever suffered from diminished capacity because, even if he has, he has not identified any reason for imposing a lower sentence. To be entitled to a lower sentence based upon diminished capacity, a criminal defendant must establish not only that he suffers from diminished capacity, but must also link it to the factors under § 3553(a) to show that he should receive a lower sentence. In *United States v. Beier*, 490 F.3d 572 (7th Cir. 2007), the Seventh Circuit concluded that even if a defendant successfully establishes diminished capacity, it does not follow that the defendant is entitled to a lower sentence. In *Beier*, a child molester / child pornographer argued on appeal that the district court erred by failing to impose a shorter sentence based upon the fact that he was molested as a child. The Seventh Circuit concluded that in addition to establishing diminished capacity, a defendant must articulate why his diminished capacity favors a shorter, rather than longer, sentence:

> The more difficult it is for a person to resist a desire for sexual contact with children, the more likely he is to recidivate, and this is an argument for a longer prison sentence. And on grounds of deterrence as well as incapacitation, for the stronger the impulse to commit a criminal act, the greater must be the threat of punishment in order to deter it.

*Beier*, 490 F.3d at 574. The Seventh Circuit also noted that the defendant's counsel failed to present evidence that "the compulsion to have sex with children is so far diminished at that age [his age at his anticipated release date] as to render the person relatively harmless, or indeed that it is diminished at all." *Id.*

Dr. Borelli has testified that Portman lives in a dream world and suffers from diminished capacity, and that those factors prevented Portman from fully appreciating the criminality of his conduct. However, Dr. Borelli did not address when or if Portman's capacity will return to normal. Without that evidence, the court has no reason to conclude that Portman will be any less likely to commit crimes upon his release than he has been thus far. To the contrary, if Portman cannot fully appreciate the criminality of his conduct, then he would be *more* rather than *less* likely to be a recidivist, a factor under § 3553(a) that would favor a longer sentence rather than a shorter one. In fact, Dr. Borelli testified that because of his diminished capacity, Portman is predisposed to committing more crimes: "we're going to be in court many other times here with Mr. Portman doing the same thing he was doing before." Sentencing Hearing Transcript (July 31, 2007) at 112.

Accordingly, even assuming that Portman suffers from diminished capacity, counsel has not identified why Portman's diminished capacity favors a lower sentence. Accordingly, Portman's motion for a lower sentence based upon diminished capacity is denied.

### III. Application of the Factors Set Forth in 18 U.S.C. § 3553(a)

Under 18 U.S.C. § 3553(a), the court must impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing, which are:

(1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment;

(2) to create adequate deterrence to crimes by others;

(3) to protect the public from future crimes by the defendant; and

(4) to provide the defendant with necessary treatment and training.

*See* 18 U.S.C. § 3553(a)(2).  To those ends, the court must take into account the following factors:

(1) the nature and circumstances of the offense;

(2) the history and characteristics of the defendant;

(3) the kinds of sentences available;

(4) the sentencing range calculated under the Sentencing Guidelines;

(5) pertinent policy statements set forth in the Sentencing Guidelines;

(6) the need to avoid unwarranted sentencing disparities among defendants with similar records or who committed similar crimes; and

(7) the need to provide restitution to victims of the defendant's offense.

*See* 18 U.S.C. § 3553(a)(1-7).  The court shall now apply those factors to the facts of Portman's case.

Portman's crimes against the financial institutions and individuals he victimized were serious offenses.  Through his schemes, he attempted to gain access to more than $1 million dollars.  Even as one financial institution caught on to his scheme, he was undeterred—he simply moved on to his next victim.  Accordingly, the nature and circumstances of his offenses favor a harsh sentence.

Next, the court will examine Portman's history and characteristics.  Portman had identified positive character reference letters that he contends favor a sentence below his Guidelines range.  The court has reviewed letters from Portman's mother (Beverly), his late father (Raymond), sister (Elsie), two rabbis (Rabbi Montrose and Rabbi Wachmann), and a long-time friend (Elvira Chavin).  The court notes that the letters attest to Portman's generally good

nature and devotion to his parents and religion.  Although the court agrees with Portman that these letters reflect positively on Portman's character, they do not identify anything particularly unique about Portman's good character.  As a result, although they favor a sentence near the low end of the Guidelines range, they do not favor a sentence below the range.

In contrast to the favorable letters, the court has also received derogatory letters from other members of the Chavin family, including Steven Schwartzbaum, Bonnie Schwartzbaum, Shari Vass, and Valorie Chavin, as well as Marc Pozan, Michelle Wolke (Portman's ex-wife), Jason Portman (Portman's son), Lee Zimmerman, and a representative of Citibank.  Those letters are stunning in their denunciation of Portman.  However, the writers of the derogatory letters did not testify at Portman's sentencing and Portman takes issue with their contents.  Accordingly, the court will not factor into its calculation of a reasonable sentence the content of the derogatory letters.

Next, the court takes into account the risks of recidivism and the need to protect the public from additional crimes by Portman.  The court found particularly telling Portman's demeanor and statements during allocution.  Not once did Portman apologize for his crimes.  To the contrary, he adamantly maintained his innocence, and even blamed the financial institutions he victimized.  Diminished capacity may explain his initial failure to recognize that his conduct was criminal.  But Portman's own psychiatrist testified that, upon being told that his conduct was wrong, Portman should have possessed the capacity to realize what he was doing and to stop: "if [Portman] didn't know what he was doing, he could have inquired whether what he was doing was wrong, and somebody would tell him that, and then he would stop doing it."  Sentencing Hearing Transcript (July 31, 2007) at 97.  Despite all the signs that Portman has now received

that his conduct was criminal (not the least of which was a verdict of guilty), the court has little confidence that Portman acknowledges the wrongfulness of his conduct or has begun down a path toward rehabilitation. It also fears that the likelihood that Portman will engage in additional criminal conduct upon his release is high. These are all factors that favor a very serious sentence.

Finally, the court believes that a lengthy term of incarceration will best deter others from committing similar crimes, promote respect for the law, and provide an atmosphere in which Portman must accept the mental health treatment he apparently needs.

## IV. CONCLUSION

For the reasons given, the court adopts the calculation of Portman's sentencing range set forth in the presentence report, and the resulting sentence range of 57-71 months. After carefully taking into account the information contained in the presentence report, the testimony and arguments offered at Portman's sentencing hearing, the favorable character reference letters, the court's observation of Portman's demeanor before the court, and Portman's own statements in allocution, the court concludes that a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing is a sentence within the middle of Portman's guideline range. Accordingly, the court imposes upon Portman a sentence to a term of incarceration of 60 months.

ENTER:

DATE: October 26, 2007

*Blanche M. Manning*
Blanche M. Manning
United States District Court